UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SETH WESSLER, | ) |
|     Plaintiff, | ) CIVIL ACTION |
| | ) DOCKET NO: 14 Civ. 5627 (PAE) |
| v. | ) |
| | ) FIRST AMENDED COMPLAINT |
| UNITED STATES DEPARTMENT OF JUSTICE | ) FOR INJUNCTIVE RELIEF |
| and FEDERAL BUREAU OF PRISONS. | ) |
|     Defendants. | ) |

**PRELIMINARY STATEMENT**

1.  This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 553, *et seq.*, for injunctive and other appropriate relief, seeking the immediate processing and release of agency records requested by plaintiff from defendants United States Department of Justice ("DOJ") and the Federal Bureau of Prisons ("BOP"). It is brought by journalist Seth Freed Wessler, to further investigative work into the federal government's increasing reliance on for-profit prisons to hold noncitizens with criminal convictions.

2.  Over the past seven years, the United States Department of Homeland Security ("DHS") has focused its immigration enforcement efforts on detaining and deporting "criminal aliens." Such individuals are increasingly charged with the crimes of "illegal reentry" and other immigration-related crimes and then held in the BOP's privately managed Criminal Alien Requirement ("CAR") facilities. These CAR facilities are also used to hold non-citizens convicted of other crimes, unrelated to immigration. In recent years, reports have emerged documenting overcrowding, mistreatment, inadequate medical care, and deaths at such facilities. Despite these reports, and notwithstanding the government's increasing reliance on private

prisons, little is known about the types of individuals held in these facilities, the conditions of confinement therein, and the nature and extent of federal oversight.

3. Mr. Wessler here seeks records pertaining to BOP's privately-managed secure facilities, including records detailing the conditions of confinement in these facilities and information concerning the processes by which private companies secure contracts to house noncitizens. He also seeks disclosure of information pertaining to the deaths of inmates held in BOP's privately managed facilities, including but not limited to the identities of those who have died while in CAR facilities, their criminal convictions and dates of incarceration, causes of death, medical and psychiatric care received, subsequent investigations into the circumstances of their deaths, communications between private facilities and government officials, policies and protocols pertaining to inmate health complaints and inmate deaths, as well as official correspondence concerning several individual private facilities in which inmate deaths have been reported. In addition, he seeks information pertaining to other BOP contract facilities and BOP-operated prisons, for comparative purposes; records pertaining to transfers from BOP contract facilities to Federal Medical Centers; records pertaining to medical classification processes; records describing disturbances in certain BOP facilities; information about inmate "representatives" in BOP contract facilities; and records pertaining to complaints brought by employees of BOP contract facilities.

4. There is a significant amount of public interest in the government's immigration policy in general, and the outsourcing of detention to private facilities in particular. Disclosure of the records sought is essential to ensure that a fully informed debate about this matter is possible.

## JURISDICTION AND VENUE

5. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. §§ 552(a)(4)(B) and 552(a)(6)(E)(iii). The Court also has jurisdiction over this action pursuant to 28 U.S.C. §1331 and 5 U.S.C. §§ 701 - 706. Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

## PARTIES

6. Plaintiff Seth Freed Wessler is a New York-based investigative journalist. He is currently a fellow at the Schuster Institute for Investigative Journalism of Brandeis University. From April 2014 to April 2015, he was a writer for NBCNews.com. From Summer 2013 to Summer 2014, he was a visiting scholar at New York University's Arthur L. Carter Journalism Institute. Prior to that appointment, he was a staff reporter for Colorlines.com, an award-winning online magazine. Mr. Wessler has received numberous honors for his reporting including the Hillman Prize, several Ippies Awards, the Reporting Award from NYU, and a Casey Medals honorable mention. In May 2014, Mr. Wessler became a Soros Justice Media Fellow, a fellowship he was awarded for the express purpose of "report[ing] on the rapid growth of for-profit federal prisons used exclusively to hold noncitizens with criminal convictions." Press Release, *Open Society Foundations Award Fellowships to 14 Visionaries Working to Reform Criminal Justice in the United States*, May 14, 2014, *available at* http://www.opensocietyfoundations.org/press-releases/open-society-foundations-award-fellowships-14-visionaries-working-reform-criminal.

7. Defendant DOJ is a Department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. §552(f)(1). Defendant BOP is a component of DOJ.

## **FACTS**

**I.   BOP'S INCREASED RELIANCE ON PRIVATE PRISONS TO HOUSE NONCITIZENS.**

8. In the last seven years, the Department of Homeland Security has focused its immigration enforcement efforts on "criminal aliens," a policy shift that is reflected in DOJ prosecutions: of all the prosecutions initiated in fiscal year 2013, more than half were for unlawfully crossing the border into the United States. *Prosecutions for 2013*, Syracuse University: Transactional Records Access Clearinghouse, *available at* http://trac.syr.edu/.

9. Many noncitizens who are charged criminally – either for illegal reentry or for non-immigration related offenses – are incarcerated in the BOP's privately managed, for-profit CAR facilities. Approximately 25,000 individuals are currently held in such facilities. *Population Statistics*, Federal Bureau of Prisons, *available at* http://www.bop.gov/about/statistics/population_statistics.jsp.

10. The BOP has expressed its long-term commitment to using private prisons to house the "low security, short-term, sentenced criminal aliens" in its custody. U.S. Dep't of Justice, FY 2015 Performance Budget: Congressional Submission; Federal Prison System, Salaries and Expenses 55-56, *available at* http://www.justice.gov/jmd/2015justification/pdf/bop-se-justification.pdf. In its fiscal year 2014 budget, BOP requested $691 million from Congress to pay private prison companies, including an increase of $26 million from fiscal year 2013 to house 1,000 additional prisoners. U.S. Dep't of Justice, FY 2014 Performance Budget: Congressional Submission. And last year, BOP issued a new solicitation for nearly 4,000 additional CAR private-prison beds. CAR XV Solicitation Number RFP-PCC-0022, Fed Biz Opps.

**II.   ABUSE AND MISTREATMENT IN PRIVATE PRISONS HOLDING NONCITIZENS.**

11. BOP subjects CAR prisons to insufficient oversight and accountability, and it exempts CAR prisons from many of the policies and regulations that ensure baselines of safe and humane treatment in federal prisons.  For example, the BOP does not require the private prison companies to provide CAR prisoners with the same vocational training, drug treatment, or other beneficial programs offered to U.S. citizen prisoners at BOP-run prisons.

12.  Moreover, while BOP has issued hundreds of "program statements" regulating prison operations, CAR contracts only require private facilities to abide by a fraction of them.  Among those absent from CAR contracts are BOP policies relating to prisoner grievances, staff hiring and training, telephone rates, and attorney visits.  American Civil Liberties Union, *Warehoused and Forgotten: Immigrants Trapped in Our Shadow Private Prison System* (June 2014) at 53 (hereinafter "ACLU Report").  Many program statements which are including in CAR contracts are violated with regularity.

13.   Investigative reports have uncovered evidence of abuse, mistreatment and discrimination in CAR facilities, which are the predictable consequence of the contractual terms governing CAR facility operations.

14. Private prison contracts and BOP's not-yet-awarded solicitations incentivize excessive use of solitary confinement or segregation by, for example, requiring facilities to use 10% of their bed space as isolation cells – nearly double the rate of isolated confinement in BOP-managed institutions.  Those in isolation spend 22 to 24 hours per day confined in a small cell with minimal human contact.  ACLU Report at 3-4.

15.  While some CAR contracts apparently require that the facilities comply with BOP policies on segregation, violations of those policies are frequent.  *Id.* at 30.  Isolation cells are routinely used for overflow when the general population dorms are full.  *Id.* at 28.  According to

some reports, prison guards send individuals to isolation cells for "failing to speak English" or for voicing grievances.  *Id.* at 4, 28.  In one incident, documented by the ACLU, 80 prisoners were placed in isolation for protesting when a prison's water supply was turned off.  *Id.* at 85.

16. Prisoners' access to emergency and routine medical care is deficient in CAR facilities.  Many CAR contracts provide that the private facilities must absorb the cost of medical care, which may create perverse incentives to limit costs by reducing medical staff and withholding treatment.  *Id.* at 42.  In Big Spring Correctional Center in Texas, for example, there is only one doctor for the entire population of 3,500 prisoners.  *Id.* at 92.  This had led to delays in the provision of medical treatment.  *Id.* at 64-68, 80-81, 88-89, 92-95, 100.

17. Many CAR facilities are overcrowded.  Such overcrowding is incentivized by the CAR contracts, which stipulate that the facilities must remain above 90% capacity and further provide for "Incremental Unit Price" payments for each additional prisoner above 90% up to 115% capacity.  As a result, private prison companies profit by admitting more prisoners from BOP than their facilities were designed to hold.  *Id.* at 36.  In Willacy, in Texas, for example, there are reports that up to 200 people are packed into a single tent with only three feet of space in between each bed.  *Id.* at 84.  In some facilities, prisoners are packed into hallways; in others, the smell of feces and urine permeates the air of sleeping quarters because the beds are located so close to the toilets.  *Id.* at 78.

18. Immigrant prisoners in CAR prisons also have far more limited access to programming, drug treatment, and work opportunities than do U.S. citizen prisoners in BOP-operated institutions, even though many have deep ties to the United States.  *Id.* at 4.

19. Such conditions have led to numerous organized protests.  For example, in the summer of 2013, 30 prisoners in Willacy were taken to isolation for refusing to leave the

recreation yard and return to their dormitories after prison officials ignored their complaints that the toilets were overflowing with raw sewage. *Id.* at 26. In 2012, as many as 300 prisoners at another CAR prison run by the Corrections Corporation of America ("CCA") in Natchez, Mississippi, started a violent protest over what they described as inadequate food, poor medical care, and mistreatment by guards. The uprising resulted in the death of one guard and the injury of nearly 20 other people. Holbrook Moh, *Sheriff: Gang Started Prison Riot in Mississippi*, Associated Press, May 21, 2012. On February 20, 2015, more than 2,000 inmates at the Willacy County Correctional Facility in Raymondville, Texas launched a two-day riot over the quality of health services, leading to the facility's closure. Seth Freed Wessler, *The True Story of a Texas Prison Riot*, The Nation, June 23, 2015.

20. In addition, there have been numerous reports of suicides and deaths resulting from medical neglect in CAR facilities. *See, e.g.*, Adriana Gomez Licon, *Inmate's Death Focus of Lawsuit*, El Paso Times, Dec. 9, 2010; Forest Wilder, *How Private Prisons Pushed Immigrant Inmates to the Brink*, Texas Observer, Oct. 7, 2009.

21. In April 2015, the Department of Justice's Office of Inspector General issued an audit report in documenting significant problems in one contract facility, the Reeves County Detention Center. DOJ Office of Inspector General, *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007 Awarded to Reeves County, Texas*, April 2015. The report flagged the persistent understaffing of health services at that facility and raised questions about the efficacy of government oversight of contactors. In June 2015, Senator Chuck Grassley issued a letter demanding that the Bureau of Prisons to respond to questions raised in the audit. Letter, *Inspector General: Millions Wasted in Private Prison Contract*, June 12, 2015, *available at*

www.grassley.senate.gov/news/news-releases/inspector-general-millions-wasted-private-prison-contract.

### III.  PLAINTIFF'S AUGUST 30, 2012 FOIA REQUESTS

22.  On August 30, 2012, plaintiff submitted FOIA requests to defendant BOP seeking: (1) records identifying the number of inmates held in BOP Privately-Manages Secure Facilities, the number of "criminal aliens" held in each facilities, their countries of origin, convictions for which they were being imprisoned, and length of incarceration in each facility; (2) a complete list of all noncitizens who died while incarcerated in CAR contract facilities, including the name, country of origin, conviction for which they were incarcerated, location at the time of death, cause of death, grievances filed, history of treatment, as well as information pertaining to how the CAR facility and/or BOP notified the family of the deceased, local and state officials, and the relevant consular offices; (3) correspondence pertaining to the deaths of individuals held in Privately-Managed Secure Facilities; (4) records pertaining to policies, practices, and training materials pertaining to how local law enforcement, BOP, and private facilities handle deaths in Privately-Managed Secure Facilities; and (5) records documenting procedures, guidelines, and correspondence – including correspondence with federal, state, and municipal officials – regarding Willacy County Correctional Center in Texas and Adams County Correctional Center in Mississippi.   (Ex. A).

23.  In conjunction with these FOIA requests, plaintiff applied for expedited processing based on the fact that Colorlines – Mr. Wessler's employer at the time of the FOIA request – is an organization that primarily engages in disseminating information, and that the information was relevant to a subject of public urgency concerning an actual or alleged Federal government activity.  5 U.S.C. 552(a)(6)(E)(i); *see also* 32 C.F.R. § 5.5(d) (BOP); 28 C.F.R. § 16.5(d) (DOJ).

24. In addition, plaintiff made a fee waiver request as a "representative[] of the news media" on the grounds that disclosure of the requested public records is in the public interest and that disclosure was "likely to contribute significantly to the public understanding of activities or operations of the government" and was "not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

25. Alternatively, plaintiff sought a limitation of processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by . . . a representative of the news media") and all applicable reductions in fees pursuant to 6 C.F.R. § 5.11(d).

26. On November 28, 2012, long after the statutory deadline to respond had passed, *see* 5 U.S.C. § 552(a)(6)(A)(i) (requiring agencies to notify a requester of a decision within 20 days of the request), defendant BOP denied plaintiff's request for expedited processing and a fee waiver. In its letter, BOP stated that plaintiff had failed to demonstrate a "compelling need" for expedited processing. In addition, BOP determined that there was "no evidence that releasing the information [requested] . . . will contribute significantly to the public's understanding regarding the incarceration and detention of criminal illegal aliens." (Ex. B).

27. Plaintiff appealed the BOP's denials in a letter dated December 18, 2012. (Ex. C). Plaintiff reiterated his argument that the ongoing public and Congressional debate about immigration policy and the use of private prisons create an urgent need for disclosure. Plaintiff also restated his contention that he was entitled to a fee waiver as a representative of the news media and that, in any event, BOP forfeited its ability to charge processing fees by failing to respond to the initial request in a timely manner. *See* 5 U.S.C. § 552(a)(4)(A)(viii).

28. In a letter dated September 30, 2013, the Chief of the Administrative Appeals Staff at the DOJ Office of Information Policy notified Mr. Wessler that his request for a fee waiver was being remanded to BOP and that BOP would contact him directly regarding its determination. However, no such determination has ever been made or communicated to Mr. Wessler. (Ex. D).

29. On June 2, 2014, undersigned counsel notified BOP by letter of its intention to file suit unless BOP processed Mr. Wessler's FOIA request by July 1, 2014. (Ex. E).

31. On July 22, 2014, Plaintiff filed a complaint to compel the BOP to process his FOIA request. BOP began producing responsive records in December 2014. Production is ongoing as of the date of this amended complaint.

## IV. PLAINTIFF'S JUNE 29, 2015 FOIA REQUESTS

32. On June 29, 2015, Plaintiff filed a second FOIA request expanding upon the original FOIA request. The second FOIA requested further information about BOP's CAR facilities as well as information about other BOP facilities, for comparative purposes. In particular, the request sought (1) aggregate data for deaths in all BOP facilities and medical records for the decedents, (2) medical records for certain individuals who died while in CAR facilities, (3) records concerning disturbances at Willacy County Correctional Center, (4) records pertaining to transfers from BOP contract facilities to BOP Federal Medical Centers, (5) records describing the medical classification process in BOP contract facilities, (6) "After Action Reports" in BOP contract facilities, (7) certain contractor reports and so-called "Cure Notices," (8) records pertaining to inmate "representatives" in contract facilities, as well as (9) complaints and grievances brought by contract facility employees. Plaintiff also requested expedited processing and a request for a fee waiver, for substantially the same reasons that he listed in August 30, 2012 request. *See supra* ¶¶ 23-24; (Ex. F).

33. In a letter dated July 1, 2015, BOP notified Plaintiff that his request for expedited processing had been denied because he had "provided insufficient information to support [his] claim regarding an urgency to inform the public regarding the [requested] records" and because he "provided insufficient information to support [his] claim [that he is] primarily engaged in disseminating information that would warrant placing [the] request before all other requests." (Ex. G).

34. In a letter dated July 7, 2015, BOP stated that due to the volume of responsive documents and the significant time required for review, it was "extending the time limit to respond to [Plaintiff's] request beyond the ten additional days provided by the statute." The July 7, 2015 letter also requested clarification regarding the scope of several of the requested items as well as further details about Plaintiff's status as a journalist. (Ex. H).

35. On July 24, 2015, Plaintiff appealed the BOP's denial of his request for expedited processing. Plaintiff explained that the records were urgently needed to "inform the national debate about noncitizens convicted of crimes," particularly in light of the increasing reliance on CAR facilities and the dearth of information about such facilities. Plaintiff also provided further information confirming his status as a Soros Media Justice Fellow and as a fellow at the Schuster Institute for Investigative Journalism. Finally, Plaintiff provided clarification as to those item requests identified in BOP's July 7, 2015 letter. (Ex. I).

36. In a letter dated August 12, 2015, BOP notified Plaintiff that it had received his July 24, 2015 appeal letter and that a response was forthcoming. (Ex. J).

37. BOP has yet to issue a substantive response to the appeal. Having failed to issue a final decision within the timeframe required by the statute, Plaintiff remedies are exhausted. *See*

5 U.S.C. § 552(a)(6)(C)(i) (administrative remedies shall be deemed exhausted if the agency "fails to comply with the applicable time limit provisions").

V.   **RELEASING THE REQUESTED DOCUMENTS WILL SERVE THE PUBLIC INTEREST.**

38.   The private prisons that are the subject of this FOIA request operate in the shadows, effectively free from public scrutiny. BOP exempts CAR prisons from many of its rules and regulations. While BOP evaluates conditions in federal prisons, it does not collect data on conditions at CAR facilities because doing so would "add cost to contracts." U.S. Gov't Accountability Office, GAO-08-6, *Cost of Prisons: Bureau of Prisons Needs Better Data to Assess Alternatives for Acquiring Low and Minimum Security Facilities* (Oct. 2007).

39.   The public has an interest in accessing information about the government's increasing reliance on for-profit prison companies to house noncitizens. As press reports demonstrate, there is sustained interest in the prosecution and incarceration of "criminal aliens," CAR facilities, conditions of confinement and contracting for new privately managed, detention facilities, jails and prisons. *See, e.g.*, *Migrants in Texas's Federal Prisons Subjected to 'Shocking Abuse*,' The Guardian, June 10, 2014; *Anxiety Ran High Before Mississippi Prison Riot Was Quashed*, CNN, May 21, 2012; *Ten Immigration Detention Centers Called Worst in US*, ABC News, Nov. 16, 2012; *How One Georgia Town Gambled Its Future on Immigration Detention*, The Nation, Apr. 10, 2012; *Private Prisons: Immigration Convictions in Record Number Fueling Corporate Profits*, Huffington Post, Sept. 27, 2012.

40. Additionally, human rights advocates have increasingly focused their attention on private incarceration facilities, calling for systemic reform, *see generally* ACLU Report, and for the closure of a number of facilities on the grounds that "[d]etained immigrants face widespread abuse and denial of basic rights, at enormous taxpayers' expense." *President Obama: Close the*

*10 Worst Immigration Facilities*, American Civil Liberties Union, Nov. 29, 2012, http://www.aclu.org/blog/immigrants-rights/president-obama-close-10-worst-immigration-detention-facilities.

41. Disclosure of the information sought in the FOIA request is especially important given that CAR funding is revisited on a yearly basis in Congress. As Congress deliberates over whether to appropriate funding for new and existing CAR facilities, it is imperative that information is made public about the conditions of confinement in these facilities and the means by which the contracts are secured.

42. Furthermore, as Congress debates immigration reform, elected officials need more information about the impact of immigration enforcement and removal policies on the criminal justice system and the incarceration of immigrants who will later be deported.

43. Our democracy is built on a foundation of an informed populace. Without access to documentation regarding the operation of private prisons, this nation is deprived of its best mechanism for holding officials accountable and its most powerful impetus to change policies. Access to information is, in sum, necessary for the functioning of a democracy. The release of the requested records will allow the public to judge for itself the legitimacy or appropriateness of the government's policies.

## CAUSES OF ACTION

### First Cause of Action: Violation of the FOIA for Failure to Expedite the Processing of Plaintiffs' Request.

44. Plaintiff repeats and realleges paragraphs 1-43.

45. Defendants' failure to expedite the processing of plaintiffs' request violates FOIA, 5 U.S.C. § 552(a)(6)(E)(iiii), and defendants' own regulations promulgated thereunder.

**Second Cause of Action: Violation of the FOIA for Failure to Make Promptly Available the Records Sought by Plaintiffs' Request.**

46. Plaintiff repeats and realleges paragraphs 1-43.

47. Defendants' failure to make promptly available the records sought by Plaintiff's request violates FOIA, 5 U.S.C. § 552(a)(3)(A).

**Third Cause of Action: Violation of the FOIA for Failure to Release Records Sought by Plaintiffs' Request.**

48. Plaintiff repeats and realleges paragraphs 1-43.

49. Defendants' failure release to records sought by Plaintiff's request violates FOIA, 5 U.S.C. § 552(a).

**Fourth Cause of Action: Violation of the FOIA for Failure to Timely Respond to Plaintiff's Request**

50. Plaintiff repeats and realleges paragraphs 1-43.

51. Defendants' failure to timely respond to Plaintiff's request violates the FOIA, 5 U.S.C. § 552(a)(6)(A)(i), and Defendant agencies' own regulations promulgated thereunder.

**Fifth Cause of Action: Violation of the FOIA for Failure to Supply a Fee Waiver.**

52. Plaintiff repeats and realleges paragraphs 1-43.

53. Defendants' failure to grant a fee waver violates FOIA, 5 U.S.C. § 552(a)(4)(A)(iii).

**REQUESTED RELIEF**

WHEREFORE, plaintiffs pray that this Court:

a) order Defendants immediately and expeditiously to process Plaintiff's FOIA requests and to disclose the requested records, waiving all processing fees;

b) award plaintiffs their costs and reasonable attorneys fees incurred in this action; and

c) grant such other relief as the Court may deem just and proper.

Respectfully Submitted,

- 15 -

                                                /s/ Ana Muñoz
Lawrence S. Lustberg, Esq.
Ana Muñoz, Esq.
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102-5310
(973) 596-4500

Dated: October 15, 2015